## MACPHERSON *v.* HOVEY.

CONTRACTS—COMPENSATION—ACTIONS — EVIDENCE — WORK, LABOR AND SERVICES.

In an action brought by an accountant for auditing the books of a corporation wherein certain directors of the company, who authorized the performance of the work, were made defendants, upon conflicting evidence tending to establish plaintiff's claim that the individual defendants were the proper contracting parties, the trial court correctly submitted the question to the jury, and a judgment in plaintiff's favor determining that the defendants were individually liable was sustained by the evidence.

Error to Wayne; Mandell, J. Submitted April 16, 1915. (Docket No. 144.) Decided June 7, 1915.

Assumpsit by Frank H. MacPherson against Horatio N. Hovey and Louis C. Sherwood for services performed. Judgment for plaintiff. Defendants bring error. Affirmed.

186 Mich.—37.

*Stellwagen & MacKay,* for appellants.

*Angell, Boynton, McMillan, Bodman & Turner,* for appellee.

MOORE, J. The plaintiff sued for services rendered as an accountant in auditing the books and accounts of the Detroit Radiator Company, of which company defendants were directors. The defense was that the work was done for the Radiator Company, and Mr. Hovey advances the further defense that it is not shown that he authorized the work to be done or is in any view of the case liable. From a verdict and judgment in favor of the plaintiff in the sum of $995.74, the case is brought here by writ of error.

Counsel for appellants say the principal question is whether or not a verdict should have been directed for the defendant Hovey as requested. The question involved is one of fact, and has required an examination of the entire record. The record discloses there were five shareholders in the Radiator Company. Defendant Sherwood held a block of stock variously stated to be either $2,000 or $3,000. Defendant Hovey and his son-in-law, Mr. Patterson, held one-half of the remaining stock, J. D. and Watson Beebe held the remainder of the stock. The capital stock of the corporation was $50,000. It is apparent some friction arose between Mr. Patterson, Mr. Hovey, and the Beebes, who were in control of the management. Mr. Sherwood testified in part:

"*Q.* Will you tell why it was necessary to have the audit made?

"*A.* I held $3,000 of the stock, I think it was, enough to control between the Beebes and Mr. Hovey and Mr. Patterson, and I had a little discussion with J. D. Beebe, and he came down and asked me to sign a check for petty cash in the drawer as assistant treasurer on account of the absence of Mr. Patterson, and I refused to sign the check, and told him I did

not think he needed that much money for petty cash in the drawer in the office, and there was a little argument, and the next day or two he offered me two for one in cash for my stock, knowing that I controlled the company, and, taking the position of the small amount of stock I held, I refused him, and reported the case to Mr. Hovey, and I said: 'If a man comes in and offers me two for one for stock that has some water in it as connected with patents, etc., he wants it for a purpose, and I think an audit of the company ought to be made, and I know nothing about the internal working of your concern.' But I know in a day or two a meeting was called of the board of directors, at which I think four were present. Whether Watson Beebe was present at that time at that meeting I am not sure. * * * After the meeting with the board of directors I had a meeting with Mr. MacPherson, at my desk in the Dime Savings Bank. Mr. MacPherson came in, and I told him we would wait until Mr. Patterson came in, and during the time we were waiting I talked over with Mr. MacPherson and told him about the company, the personnel of the company, sort of a running visit, waiting for Mr. Patterson.

"Q. Did you tell him why you were there and on whose behalf you were there?

"A. I said I was chairman of the committee appointed to select an auditor for the Detroit Radiator Company. I told Mr. MacPherson that I was chairman of a committee appointed to select a suitable auditor for the purpose of auditing the books and accounts, etc., of the Detroit Radiator Company. There was nothing said about Mr. MacPherson working with me and Mr. Hovey individually.

"Q. Was anything said by you that you and Mr. Hovey would pay for this work?

"A. Absolutely no; this preliminary report I think was handed to me, and then sent to Mr. Patterson, treasurer of the company."

It is the claim of Mr. MacPherson that he was hired by Mr. Sherwood to do the work for Mr. Hovey and Mr. Sherwood, and that it was done for them, and not for the Radiator Company. The preliminary re-

port referred to by Mr. Sherwood (Exhibit B) began as follows:

"MESSRS. H. N. HOVEY and L. C. SHERWOOD,
        "Directors of the Detroit Radiator Company,
                "Detroit, Michigan.
*"Gentlemen:*
"Pursuant to your instructions, we have made an inventory of the equipment, tools, machinery, goods, materials, and supplies of your company, as of June 6, 1910. At your request we submit herewith an interim report showing the financial condition of the company as of June 6, 1910."

The following letter (Exhibit D) was sent:

"August 19, 1910.
"H. N. HOVEY, ESQ.,
"L. C. SHERWOOD, ESQ.,
        "Detroit, Mich.
*"Gentlemen:*
"Requiring funds, we will be pleased if you will let us have a check for the whole or a substantial part of our account for services rendered in connection with the Detroit Radiator Company's examination. We shall be pleased if you can arrange this by the 23d of the present month.
                "Yours very truly,
                        "F. H. MACPHERSON & CO."

Other correspondence followed.

Mr. Hovey was called as a witness by the plaintiff under the statute. Exhibits B and D were shown to him. He testified of Exhibit B that it was delivered to him. He was asked:

"*Q.* When you had seen this did you take any steps to apprise Mr. MacPherson that you claimed that he was not acting for you, and that you received this report directed to you and Mr. Sherwood?
"*A.* I took it as it read there. It was given to us as directors of the Detroit Radiator Company, and not as individuals.
"Question repeated.
"*A.* I did not."

He was questioned as to Exhibit D:

"*Q.* Will you look at 'Exhibit D'? Was that letter delivered to you through the mail by Mr. MacPherson?

"*A.* I cannot answer that. I looked through my files this morning to see if I could find any communication, and I found none, and I don't remember seeing it.

"*Q.* You don't recollect whether you received it?

"*A.* No, sir.

"*Q.* You would not say you did not?

"*A.* No."

He says if he received it he sent no reply to the plaintiff. Mr. Sherwood testified that he turned the reports and letters over to Mr. Patterson and did not reply to them. The Radiator Company shortly afterwards went into bankruptcy, and Mr. Patterson solicited the plaintiff to file his claim against the company. He declined to do so, insisting it was the debt of Mr. Hovey and Mr. Sherwood.

Mr. Boothe testified, in substance, that he presented the account to Mr. Sherwood, who asked him to see Mr. Hovey.

"I then went to see Mr. Hovey and presented the bill to him. Mr. Hovey said he had been out of the city for some time, and that he had not before seen a copy of the bill, nor had he heard the amount of it.

"*Q.* Did or did not Mr. Hovey make any statement at that time about the charge being made against the wrong party?

"*A.* No; he simply stated that he would take the matter up with Mr. Sherwood and arrange the matter satisfactorily in a few days."

Cross-examination:

"*Q.* Where was this conversation?

"*A.* With Mr. Sherwood in Mr. Sherwood's office in the Dime Bank, and with Mr. Hovey at his own office in the Hammond Building.

"*Q.* Didn't Mr. Hovey at that conversation tell

you distinctly that that was a matter of the Detroit Radiator Company and not his own?

"*A.* No, sir; he did not tell me that."

Mr. Hovey gave an entirely different version of this conversation, and said he told Mr. Boothe the bill was for the Radiator Company to pay.

In Mechem on Agency (2d Ed.), § 430, is found the following language:

"But since, as has been seen, authority for the doing of any lawful act—except in those cases in which an authority in writing or under seal is expressly required—can be conferred by parol, and since the existence of such authority may be inferred from the conduct of the parties, so also, with the same exceptions, the unauthorized doing of any such act may be ratified by parol, and the fact of such ratification may likewise be inferred from the conduct of the parties. In this case also, as in the other, it will be found that this is the most usual method by which the result is effected.

"Ratification, like authorization of which it is the equivalent, is generally the creature of intent, but that intent may often be found by the law in cases where the principal, as matter of fact, either has no express intent at all, or had an express intent not to ratify.

"The acts, words, silence of the principal which are relied upon are sometimes spoken of as in themselves a ratification. As a rule, however, this is not strictly accurate. They are rather the evidence of a ratification than the ratification itself."

See, also, Mechem, §§ 451, 452.

In section 453 of the same author is the following:

"But even though silence may not be *per se* conclusive, and even though estoppel be for the time being excluded, it is entirely safe to say that silence or a failure to repudiate may often be *evidence* of an assent, more or less strong under the circumstances, from which, as a matter of fact, an inference of assent may be drawn. The question seems to be this: From the failure to dissent, under the circumstances,

would the ordinary intelligent man be justified in inferring that the principal assented? Like other similar questions, this would be for the jury, unless reasonable men could fairly draw only one inference from the facts, and in that case the court may decide it."

In view of the circumstances under which the work was done and the conflicting testimony as to the hiring and the correspondence, we think the trial judge was right in declining to direct a verdict in favor of Mr. Hovey.

A portion of the charge is criticised, but it should be read in connection with the rest of it. The charge makes nearly eight pages of the printed record. If the case was to be given to the jury at all, every phase of it was covered by the instructions of the judge. The other assignments of error do not call for discussion.

Judgment is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.